# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JAMAHL RICE,             *

Plaintiff                *

v                        *    Civil Action No. RDB-17-3635

WARDEN FOXWELL, *et al.*, *

Defendants               *

***

## MEMORANDUM OPINION

The pro se Plaintiff Jamahl Rice filed the above-captioned civil rights action alleging a variety of claims against medical and correctional staff at Eastern Correctional Institution and Metropolitan Transition Center. ECF No. 1. Defendants filed Motions to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 22 (motion filed by correctional staff); ECF No. 30 (motion filed by medical staff).[1] Although notified of his right to do so, ECF Nos. 23, 31, Plaintiff has not responded to either Motion, and the time for doing so has expired. Nevertheless, his submissions have been liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

The matter is now ripe for review. The Court finds a hearing in these matters unnecessary. *See* Local Rule 105.6. For the reasons that follow, Defendants' dispositive Motions, construed as Motions for Summary Judgment, are GRANTED.

## BACKGROUND

Plaintiff's Complaint identifies several unrelated incidents that occurred at Eastern Correctional Institution (ECI) and Metropolitan Transition Center (MTC). ECF No. 1. To facilitate review of these claims, the Court identifies each of Plaintiff's claims followed by

---

[1] Subsequently, Medical Defendants filed a Supplemental Motion for Summary Judgment (ECF No. 32), presenting observations about Plaintiff unrelated to the time or place that is the focus of Plaintiff's Complaint. This Supplemental Motion is irrelevant to resolving the instant case and shall be terminated as moot.

Defendants' response (in the form of affidavits and sworn records).

**(1) Incident with Sorenson & Mathews**

a. Plaintiff's Allegation

Plaintiff alleges that when he arrived at ECI on July 17, 2017, he informed an unnamed nurse who was responsible for medical clearance that he had a dislocated shoulder. The nurse ignored him and cleared him to be housed in general population. ECF No. 1 at 1. Plaintiff was then returned to his "side of the prison," where he again was reviewed by medical staff, including Nurse Sorenson. Id. Plaintiff claims that he showed Sorenson medical paperwork from another institution stating that his shoulder was dislocated, but Sorenson told Plaintiff he "was lying" and "took [Plaintiff's] paperwork." Id. at 1. Plaintiff raised his voice at Sorenson, prompting Lieutenant Mathews to place Plaintiff on "lock up . . . for disrespect."[2] Id. at 2.

b. Defendants' Response

Medical records reflect that, on July 14, 2017, an outside medical provider performed a surgical procedure on Plaintiff's left shoulder. ECF No. 30-4 at 21-22. After being temporarily housed at Jessup Correctional Institution, Plaintiff arrived at ECI-West on July 17, 2017. Id. at 23-25. He was initially evaluated by Amanda Morris who consulted with Dr. Clem before clearing Plaintiff to return to regular housing. Id. at 25. Thereafter, he was sent to the east side of the facility (the apparent location of Plaintiff's unit), where he saw Sorenson before he was to be placed in general population. The notes of Plaintiff's encounter with Sorenson state:

> Inmate returned to the west side after being cleared to return to his unit after an off site visit; inmate insists that he is due for a dose of oxycodone which I explained he had no order for and it is not available on the compound. Inmate continues to argue that he needs it and it is ordered. Inmate is moving his affected arm without

---

[2] Throughout this memorandum opinion, the Court has modified the some of the capitalization when quoting from Plaintiff's filings in order to conform with ordinary writing convictions. These capitalization modifications are not otherwise acknowledged, though all other modifications are acknowledged.

any issues and will not put his sling on as instructed by myself and the RN.

ECF No. 30-4 at 27.

Correctional Defendants have submitted a copy of the notice of infraction authored by Mathews relating to this incident. ECF No. 22-3 at 4. The notice alleged that Plaintiff yelled and made "aggressive facial expressions" at Sorenson, and that "[a]fter speaking with the medical staff it was determined that [Plaintiff] misrepresented his medical condition by presenting medical documentation that he was not allowed to have from a previous institution." *Id.* At his disciplinary hearing, Plaintiff entered into an informal resolution with the institutional representative through which the charges were dismissed and Plaintiff was sanctioned with 10 days of cell restriction. *Id.* at 8.

## 2. Westbrook & Infractions

### a. Plaintiff's Allegation

Plaintiff states that, after arriving on lock up, "I told Officer Westbrook about the pain I was in and I explained the process I went through up till that point, so I was ignored by Officer Westbrook." ECF No. 1 at 2. Plaintiff's Complaint also alleges that Westbrook frequently harasses him and "has given [him] at least 6 or 7 infractions for no reason at all." *Id.* Plaintiff alleges that Westbrook's actions have "resulted in [him] lo[]sing [his visits] and good days." *Id.* at 4.

### b. Defendants' Response

Westbrook avers that he reported Plaintiff "for violations of rules governing inmates on a number of occasions, including during July and August 2017. . . . I reported inmate Rice's conduct based on my observations, familiarity with rules governing inmate conduct, and duties to promote institutional safety and security." ECF No. 22-8. Defendants have also submitted copies of four

3

notices of inmate rule violation issued against Plaintiff by Westbrook, charging Plaintiff with violations resulting from Plaintiff's refusal to follow instructions to remove his arm from the cell slot. ECF No. 22-3 at 13, 22, 31, 40. As to each of the four rule violations, Plaintiff reached an informal agreement with the institutional representative at the disciplinary hearing whereby Plaintiff pled guilty to at least some of the charges and received a sanction of 60 days' cell restriction. *Id.* at 18-19, 27-28, 36-38, 45-46. None of the informal agreements involved the loss of accrued good time credits. *Id.*

### 3. Sick Calls Ignored/General Medical Claims

a. <u>Plaintiff's Allegation</u>

Plaintiff alleges that upon arriving on lock up following his interaction with Sorenson and Matthews (no date provided), he immediately filed a sick call slip regarding his dislocated shoulder, but "17 days went by" without a response. ECF No. 1 at 2. Plaintiff further claims that, as a consequence of his sick call request being ignored for more than two weeks, the "emergency room Doctors would not touch" Plaintiff when he was sent to the hospital for treatment of his arm on an unspecified date. *Id.* at 2. The doctors at the outside hospital told Plaintiff to return "in 7 days to discuss emergency surgery. The prison did not honor these instructions. So now [Plaintiff] need[s] surgery because of the neglect." *Id.*

Additionally, Plaintiff reports that, as of the date he mailed his (undated) Complaint, he still had a dislocated shoulder requiring surgery and he remained in a great deal of pain. *Id.* at 2-3. He makes broad allegations that medical staff have failed to treat his shoulder injuries over a period of several months. *Id.* at 1, 3. Plaintiff does not connect these allegations about his sick calls being ignored or general problems with his medical treatment to any particular Defendant.

b. <u>Defendants' Response</u>

4

Although Plaintiff does not provide the relevant date, the exhibits submitted by Defendants suggest that his placement on administrative segregation occurred on July 17, 2017. *See* ECF No. 22-3 at 4 (date of Matthew's infraction notice); Corr. Defs' Ex. 4 at 15 (date of interaction with Sorenson). According to Plaintiff's medical records, he was seen by medical providers numerous times in the days following his placement on lock up, including spending several days in the institutional infirmary. Corr. Defs' Ex. 4 at 17-18, 20-21, 32, 34-39 (seen by providers July 19, 20, 24, 25).

On September 1, 2017, Plaintiff was sent to the emergency department at the University of Maryland Medical Center (UMMC) where he underwent a closed reduction of his left shoulder under sedation. *Id.* at 67-68. He was told to follow up with an orthopedic specialist at UMMC in one to two weeks. *Id.* However, Plaintiff was already scheduled to see a different orthopedic doctor at Johns Hopkins Hospital (JHH) on September 28, 2017, to address problems with the same shoulder, so no follow-up appointment was made with UMMC. *Id.* at 82.

As to Plaintiff's general claims that his medical needs have been ignored, Defendants' exhibits reflect that Plaintiff was evaluated by institutional medical providers scores of times between July 17, 2017 and the filing of this action in early December 2017, including a two-and-a-half month stay for monitoring at the Division of Corrections' infirmary at MTC. ECF No. 30-5 (affidavit from Dr. Clem); *see generally* Corr. Defs' Ex. 4. Plaintiff was sent to outside medical providers on several occasions, where he underwent orthopedic procedures on his shoulders and medical imaging. *See* Corr Defs' Ex. 4 at 67-72 (closed reduction and x-ray of left shoulder at UMMC on September 1, 2017); *id.* at 77-78 (office visit at JHH on Sept. 28, 2017 regarding his left shoulder); *id.* at 91 (seen by Dr. Mathew at St. Joseph's Hospital for consult on October 16, 2017); *id.* at 154 (sent to JHH on October 22, 2017, where medical imaging and attempted closed

5

reduction on right shoulder were performed); ECF No. 30-6 (closed manipulation of shoulder at Bon Secours Health System by Dr. Krishnaswamy); *see also* ECF No. 30-5. During this time, Plaintiff regularly received medication to treat his pain. *See* ECF No. 30-5 at 9; Corr. Defs' Ex. 4.

### 4. Fall in Shower on October 22

a. <u>Plaintiff's Allegation</u>

Next, Plaintiff alleges that:

> My right shoulder was dislocated on Oct 22 by slipping in the shower on a bar of state soap in the infirmary. The bathroom was filthy and it should not have looked that way in a hospital[;] that[']s very unsanitary so when I fell I hit my head on the wall and was knocked unconscious[.] When I woke up I was in a paramedics [sic] and my right shoulder was dislocated[.] I went to Johns Hopkins Medical Center.

ECF No. at 3. Plaintiff blames his injury on "the institution not inspecting toiletry facilities like they should that is why they have inmate working men who specifically clean the bathroom and by them not doing their job I was badly hurt." *Id.* Plaintiff does not attribute responsibility over this failing to any particular person, nor does he articulate how the "filthy" state of the bathroom resulted in him "slipping in the shower on a bar of state soap."[3]

b. <u>Defendants' Response</u>

In response, Defendants have submitted an affidavit from Corporal Brittany Distance, who reports that

> On October 22, 2017, at 1030 hours, detainee Kemper used the handicap shower. At 1130 hours, Mr. Rice was the next inmate to use the handicap shower, per his request. I had inspected the shower between detainee Kemper's use and inmate Rice's use and found the shower to be clean and ready for use. My inspection was thorough, to make sure there was no contraband or other material left behind by the last inmate to use the shower. There was no soap or other debris in the shower immediately before inmate Rice's use.

---

[3] It is possible that Plaintiff means that a bar of soap was left behind by those individuals responsible for cleaning the shower.

6

ECF No. 22-10 at 2. Distance has also submitted an excerpt from the logbook for the day in question, which supports the timing reflected in her affidavit. *Id.* at 3-4.

### 5. Fall in Shower on November 9

#### a. Plaintiff's Allegation

Plaintiff also claims that he fell in the shower on November 9, 2017. He goes on to say that

> When I called for the nurse she did not respond until[] about 45 mins which I was on 30 min observation which means the officer is supposed to check on me every 30 min. When the nurse [ostensibly, Nurse Florence] came in my cell she said why were you in the shower? I told her because it[']s been 1 week and you did not offer to help me.

*Id.* at 4. Male officers arrived on the scene to help move Plaintiff, but he refused, requesting that medical staff assist him instead. *Id.* Therefore, "Nurse Florence went all the way to the west side of the prison to get a doctor named Bruce," who is not named as a Defendant. *Id.* at 5. Plaintiff's Complaint does not allege any further involvement from Florence after she fetched Bruce.

Plaintiff reports that Bruce and some of the officers tried to lift Plaintiff from the floor, but Plaintiff's

> shoulders were in so much pain I told the officers to leave me alone it hurts, so the doctor said your [sic] refusing treatment? I said no and the doctor and officer left me in the cell on the floor for 4 hours. . . . This is all document by the inmate observation worker who sat outside my cell window as the officer instructed him to watch me.

*Id.*

#### b. Defendants' Response

According to verified medical records submitted by Defendants, on November 8, 2017,[4] Nurse Florence Enoch observed that Plaintiff was "laying down in the shower with his legs sticking

---

[4] Enoch says that the incident occurred at 9:00 pm on November 8, 2017, which differs from Plaintiff's statement that the fall occurred on November 9, 2017. However, the difference in date is not material to resolving this claim.

7

out, and head against the back wall, states he fell." Corr. Defs' Ex. 4 at 238. Plaintiff asked for help from medical staff and stated that he wanted to be sent to the hospital. *Id.* Nurse Enoch obtained assistance from PA Bruce Ford; on Ford's arrival "inmate refused all and any help from nursing, PA and custody and wanted to be left alone. Refused meds from LPN." *Id.* Enoch requested that someone monitor Plaintiff due to his "refus[al] to get up." *Id.* Less than three hours after the fall, Plaintiff asked for pain medication, which Enoch provided. *Id.* When Enoch gave Plaintiff the medication, he was observed to be standing and walking in the cell. *Id.* The following morning Plaintiff verbalized no complaints and was walking in his cell without issues. *Id.* at 239. An affidavit submitted by Dr. Jason Clem reiterates the medical notes and reports that, in his medical opinion, there is no evidence that Plaintiff was injured during this fall. *Id.*

## LEGAL STANDARD

Defendants have filed Motions to Dismiss, or, in the Alternative, for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent that grounds for dismissal are based solely on the contents of the Complaint, the Court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pled allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the

plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the reasons why summary judgment is premature. *See Harrods, Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Here, Plaintiff has not filed a Rule 56(d) affidavit or otherwise requested discovery in this matter, nor has he submitted an Opposition to Defendants' Motions, which contain relevant record evidence also provided to Plaintiff. Under these circumstances, the Court will construe Defendants' Motions as Motions for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Because he is proceeding pro se, Plaintiff's submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, this Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## DISCUSSION

### A. Correctional Defendants: Failure to Exhaust

Correctional Defendants raise the affirmative defense that Plaintiff has failed to exhaust his administrative remedies as to his claims against them. ECF No. 22-1 at 12. If Plaintiff's claims have not been properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

An inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which means using all steps that the agency

holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* at 93 (internal quotation marks omitted)

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, Plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even if the specific relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is considered "unavailable" and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Although the United States Court of Appeals for the Fourth Circuit has not decided the issue, the weight of circuit authority indicates that the administrative process must be fully

12

completed before the complaint is filed. *See Neal v. Goord*, 267 F.3d 116, 121–22 (2d Cir. 2001) (holding that inmates must exhaust before filing suit); *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) (same); *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 534–35 (7th Cir. 1999) (same); *see also Kitchen v. Ickes*, 116 F. Supp. 3d 613, 624 (D. Md. 2015) ("Exhausting administrative remedies after a complaint is filed will not prevent a case from being dismissed for failure to exhaust administrative remedies."); *but see Williams v. Norris*, 176 F.3d 1089, 1090 (8th Cir. 1999) (holding that inmates must exhaust before the district court issues a ruling).

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has an established administrative procedure for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S."), §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.02.28.02(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a). "A court may not consider an individual's grievance that is within the jurisdiction of the [Inmate Grievance] Office or the Office of Administrative Hearings unless the individual has exhausted the remedies" set forth in C.S. Title 10, Subtitle 2. C.S. § 10-210(a).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional administrative remedy procedure ("ARP") process, before filing a grievance with the IGO. *See* C.S. § 10-206(b). There is an established ARP process that applies to all Maryland prisons. COMAR 12.02.28.01 *et seq.* Therefore, when the ARP process provides

13

a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" COMAR 12.02.28.02(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Corrections. COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B). If the Commissioner fails to respond, the grievant shall file his appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing." C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208; COMAR 12.07.01.07-.08. The

conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md. Code Ann., State Gov't § 10-206(a)(1).

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2). However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* COMAR 12.07.01.10(B); C.S. § 10-209(b)(2)(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

Correctional Defendants have submitted an affidavit from Samiyah Hassan, an administrative officer with the IGO. ECF No. 22-12. Hassan avers that Plaintiff has not filed any complaints or grievances with the IGO between October 2014 and May 8, 2018, the date of her affidavit. *Id.* Having failed to submit any grievance to the IGO, Plaintiff has not exhausted his claims against Correctional Defendants. Further, Plaintiff does not argue that administrative remedies were unavailable to him for any of the reasons identified by the *Ross* court. Thus, the Court agrees with Correctional Defendants that Plaintiff's claims against them must be rejected for failure to exhaust administrative remedies.

### B. Medical Defendants

The administrative procedure detailed in the preceding section does not extend to claims

15

against contract medical providers. *See* C.S. § 10-206(a) (IGO available for grievances "against an official or employee of the Division of Correction or the Patuxent Institution"). Moreover, Medical Defendants do not allege that Plaintiff failed to take any administrative steps regarding his claims against them. Thus, the Court turns to the substance of Plaintiff's claims against the medical providers.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "[D]eliberate indifference requires more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 696 (internal quotation marks omitted).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that

16

is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component is satisfied only where a prison official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105-06; *see also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.").

(1) Sick Calls Ignored/General Medical Claims

As to Plaintiff's claim that his sick calls were ignored for 17 days following his placement in segregation on July 17, 2017, the certified medical records submitted by Defendants plainly refute this assertion. Corr. Defs' Ex. 4 at 17-18, 20-21, 32, 34-39. Turning to Plaintiff's broader claim that he has not received adequate care for his shoulders over a period of several months, the Court concludes that Plaintiff cannot establish the subjective element of a deliberate indifference claim. Plaintiff has not identified any specific incident in which his medical needs have been

disregarded, nor has he tied his claim to any particular medical provider. As summarized in the Background section, Plaintiff's unrefuted medical record shows that he has been repeatedly evaluated and treated by institutional providers, housed in the infirmary, and received appointments and procedures with outside providers. Although Plaintiff characterizes the providers as "negligent" because the treatment rendered has failed to repair Plaintiff's dislocations or keep them from recurring after they have been repaired, ECF No. 1 at 5, negligence alone does not satisfy the subjective element. *Estelle*, 429 U.S. at 105-06.

(2) <u>Nurse Sorenson</u>

Plaintiff does not clearly allege that any aspect of Sorenson's medical evaluation was deficient; indeed, in the incident identified by Plaintiff, he was not seeking treatment from Sorenson, but was briefly "seen" by her when he returned to his side of the facility after another provider cleared him to return to general population. ECF No. 30-4 at 25-27. It appears that Plaintiff's claim against Nurse Sorenson stems from Sorenson saying that he was lying about aspects of his medical treatment and raising her voice at Plaintiff in the leadup to Mathews issuing an infraction against him. ECF No. 1 at 1-2. However, neither of these actions amounts to a constitutional violation. *See Henslee v. Lewis*, 153 F. App'x. 178, 180 (4th Cir. 2005) (" Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983."); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979).

(3) <u>Nurse Florence (Enoch)</u>

Plaintiff mentions "Nurse Florence" in connection with his fall on November 8 or 9, 2017. Although Plaintiff assigns fault for the incident to various people such as the unnamed officer who was supposed to check on Plaintiff every 30 minutes or Physician's Assistant Bruce and the unnamed officers who tried to lift Plaintiff from the shower floor before leaving him there for

several hours, Plaintiff does not allege that Nurse Florence played any part in these actions or omissions. ECF No. 1 at 4-5. Rather, Plaintiff only faults Florence because it had been a week since Plaintiff's last shower and she "did not offer to help [him]," which prompted Plaintiff to take a shower without assistance. *Id.* at 4. However, Plaintiff's Complaint fails to suggest that Florence was the sole individual capable of helping Plaintiff or that Florence was even aware of Plaintiff's desire to take shower at that time. Plaintiff states that Florence "did not offer" to assist him, but he fails to explain why the onus was on her to offer him assistance rather than on him to request it. Plaintiff's allegations regarding Nurse Florence simply do not amount to a cognizable claim.

## CONCLUSION

Accordingly, the Court construes Defendants' dispositive Motions (ECF Nos. 22, 30) as Motions for Summary Judgment and grants both Motions. Medical Defendants' Supplemental Motion (ECF No. 32) is terminated as moot. A separate Order follows.

January 31, 2019
Date

_/s/ Richard D. Bennett_
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE